MARIGOLD V. HARTMAN,

             **Plaintiff,**

-v-

CONSECO SENIOR HEALTH
INSURANCE COMPANY, et al.,

             **Defendants.**

Case No. 3:08-CV-099

Judge Thomas M. Rose

---

### ENTRY AND ORDER OVERRULING HARTMAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. #57) AND FINDING CONSECO'S MOTION TO STRIKE (Doc. #71) MOOT

---

Now before the Court is a Motion for Partial Summary Judgment filed by Plaintiff Marigold Hartman ("Hartman"). (Doc. #57.) The Defendants filed their Response In Opposition on April 1, 2010, (doc. #63) and Hartman filed her Reply on April 21, 2010 (doc. #69).

On April 27, 2010, the Defendants filed a Motion To Strike Deposition of Dominick LaGravinese ("LaGravinese"), Or, In the Alternative, for Leave To File a Sur-Reply. (Doc. #71.) On April 29, 2010, the Court granted Defendants leave to file their Sur-Reply and ordered that the second portion of the Motion To Strike asserting evidential objections to specific portions of LaGravinese's Deposition remain pending. (Doc. #73.) On May 10, 2010, the Defendants filed their Sur-Reply. (Doc. #74.) On May 11, 2010, Hartman filed her Response to the Motion To Strike (doc. #75) and on May 14, 2010, the Defendants replied (doc. #76). Thus, Hartman's Motion for Partial Summary Judgment and the Defendants' Motion To Strike are both now ripe for decision.

The Defendants in this matter are Senior Health Insurance Company of Pennsylvania and

Conseco Senior Health Insurance Company (collectively referred to hereinafter as "Conseco"). Hartman's First Amended Complaint brings three claims: one for breach of contract, one for failure to exercise good faith in the processing and payment of a claim, and one for successor liability. Also, Hartman seeks punitive damages and attorneys' fees on her claim of failure to exercise good faith in the processing and payment of a claim.

Hartman now seeks summary judgment on her breach-of-contract claim and on her claim that Conseco failed to exercise good faith in the handling and processing of her insurance claim. She also now seeks punitive damages. However, according to Hartman, summary judgment is sought on liability only.

Conseco responds that summary judgment should not be granted on the breach-of-contract claim because Hartman has not shown damages and that genuine issues of fact preclude summary judgment on Hartman's failure-to-exercise-good-faith claim. A factual background will first be set forth followed by the relevant legal provisions and an analysis of each of the claims on which Hartman seeks summary judgment.

## FACTUAL BACKGROUND

Hartman is a 91 year-old resident of Dayton, Ohio who lives with her daughter, Paula Hartman. (Deposition of Marigold V. Hartman ("Hartman Dep.") 4-5 Dec. 17, 2008.) In 1998, Hartman purchased a Home Health Care insurance policy from Conseco, then known as American Travelers Life Insurance Company. (Id. at 7.) At the time of the purchase, agent John Samples provided Hartman and Paula Hartman with brochures describing the benefits and use of the policy. (Id. 9.)

Hartman purchased an "HHC-4" policy which provided cash benefits for necessary home

healthcare. (Id. Ex. 5.) There is no dispute that Hartman was insured under the HHC-4 Policy.

The HHC-4 Policy, number 681131, issued to Hartman with an effective date of April 20, 1998, includes a Homemaker Services Rider (the "Rider"). (Id.) The Rider includes a provision that Conseco, will provide a "Care Plus Consultant" and that the "Care Plus Consultant" would develop a Plan of Care to meet individual needs. (Id.) This Rider also says that a "Care Plus Consultant" will meet with the insured to assess the insured's individual needs. (Id.)

Hartman made the initial premium payment and made all of the necessary premium payments over the next eight years. (Id. 12, 15.) Then, in 2006, her health significantly deteriorated. (Id. 16.)

In April of 2006, Hartman had major surgery to repair an abnormal aortic aneurysm. (Id.) She had previously lost a kidney and, as a result of the aneurysm repair surgery, her one remaining kidney was damaged. (Deposition of Paula Hartman ("Paula Hartman Dep.") 45 June 24, 2009.) After the surgery to repair the aortic aneurysm, Hartman went into total renal failure that required her to begin dialysis the very next day. (Id. 46-47.) She will be required to take dialysis for the remainder of her life. (Id. 46-47.) There is no dispute that Hartman's medical conditions qualified her for home healthcare and homemaker service benefits.

Paula Hartman was able to take care of Hartman for a period of time until she became unable to do so because of hip problems of her own. (Id. 51.) A company called "Alternate Solutions" then began providing care to Hartman sometime after July of 2006. (Id.)

In August of 2006, Hartman's son, Ted Hartman, moved from his home in Florida to Dayton to become Hartman's caregiver. (Hartman Dep. 21-21.) According to Hartman, Ted Hartman cared for Hartman for four months, from September through December of 2006. (Id.

22.)

## The Homemaker Services Rider

On August 14, 2006, Paula Hartman called Conseco and asked about homemaker's benefits under the HHC-4 Policy. (Deposition of Mary Beth Miller ("Miller Dep.") 65-67 Oct. 19, 2009.) Conseco representative Terry Turner informed Paula Hartman that Hartman's HHC-4 Policy did not include the Homemaker Services Rider. (Id. 67-68.) Paula Hartman did not request home healthcare services under the HHC-4 Policy at the time because Medicare was paying for the medical services provided by Alternate Solutions. (Paula Hartman Dep. 50.)

On August 14, 2006, Paula Hartman called Conseco again. (Miller Dep. 76.) This time Paula Hartman talked to Conseco representative LaShell Smith. (Id.) Paula Hartman indicated to LaShell Smith that she had information that shows that Hartman's HHC-4 Policy included the homemaker coverage. (Id. 77.) LaShell Smith advised Paula Hartman that she would obtain a copy of the HHC-4 Policy and call Paula Hartman back. (Id. 77-78.) LaShell Smith determined that the HHC-4 Policy did not include a homemaker/companion benefit. (Id. 78.)

On August 24, 2006, Paula Hartman called Conseco again. (Id. 81.) This time she talked with Conseco representative Kirsten Maloney. (Id. 81.) Kirsten Maloney informed Paula Hartman that the HHC-4 Policy is not listed as having homemaker services. (Id. 82.) Kirsten Maloney and Paula Hartman agreed to exchange their respective copies of the HHC-4 Policy. (Id.)

Yet another phone call took place between Paula Hartman and a Conseco representative, Scelena Courtney, on August 29, 2006. (Id. 83.) Paula Hartman was then informed that the HHC-4 Policy included the Homemaker Services Rider. (Id.)

## The Care Plus Consultant

On October 26, 2006, Paula Hartman again called Conseco. (Id. 117-18, Ex. 2.) During this call, she specifically requested a Care Plus Consultant. (Id.) However, according to Hartman, a Care Plus Consultant was never provided. (Hartman Dep. 20; Paula Hartman Dep. 99.)

This same day that Paula Hartman called Conseco, Hartman's file was transferred to Conseco's Managed Care and reviewed by Teresa Vowels. (Affidavit of Suzanne Morris ("Morris Aff.") Ex. A Mar. 31, 2010.) Teresa Vowels then called Paula Hartman to discuss the care Hartman was receiving and that a plan of care would be developed. (Id.) Vowels developed a plan of care for Hartman and approved the hours of home healthcare received by Hartman. (Deposition of Theresa Vowels ("Vowels Dep.") 93-94 Oct. 6, 2009.) Vowels testified that she was not aware that there was such a person as a Care Plus Consultant. (Id. 93.)

Mary Beth Miller, who held various positions at Conseco since October 27, 2003, including call center representative, claims adjuster and risk management analyst, testified that she had never heard the terms "care plus advantage" or "care plus consultant" used at Conseco. (Miller Dep. 8, 21-22, 44.) Suzanne Morris, who held various positions at Conseco since April of 2004, including claims adjuster, claims auditor and business analyst, testified that she had heard the terms "care plus advantage" and "care plus consultant". (Deposition of Suzanne Marie Morris ("Morris Dep.") 8, 10, 12 15 Oct. 20, 2009.) However, Morris did not remember any claims for the care plus consultant, reviewing any claims for this benefit, or any correspondence requesting this benefit. (Morris Dep. 17.)

## The Physician's Claim Form

There were also issues regarding the submission of a Physician's Claim Form for

Hartman's claim. A physician's claim form is a form provided by the treating physician showing that the insured has medically necessary home healthcare, cognitive impairment or the inability to perform two activities of daily life ("ADLs"). (Miller Dep. 111.)

The record includes a "Home Health Care Physician's Certification" with an illegible signature and no date. (Miller Dep. Ex. 3.) Miller testified that Conseco received this form on August 23, 2006. The record also includes a "Physician's Claim Form" dated August 25, 2006, with what appears to be the same illegible signature. (Miller Dep. Ex. 4.) On this form, the doctor certified that Hartman, among other things, needed four hours of home healthcare every day and around-the-clock homemaker services. (Vowels Dep. 184, Ex. 8.) Thus, according to Miller, Conseco had a physician's claim form in August of 2006. (Id. 113.)

Although there is evidence that Paula Hartman was told several times that it would take up to thirty (30) business days to process a claim (Miller Dep. 109, Ex. 2) , Hartman has not identified evidence that she was told that she needed another physician's claim form after Conseco already had one. Conseco's records, however, indicate that Conseco believed on October 23, 2006, that it did not have a physician's claim form. (Miller Dep. 109, Ex. 2.)

**Independent Healthcare Assessment**

Hartman also raises an issue regarding an independent healthcare assessment ("IHA"). An IHA was performed on Hartman on September 29, 2006, by Long Term Care Solutions (Miller Dep. 126, Ex. 6) and another IHA was performed on Hartman by Dimensions In Managed Care on November 13, 2006 (Miller Dep. 127, Ex. 7). Teresa Vowels, Conseco's case manager for Hartman's claim, was told by Teresa Fevert, supervisor of claims, that, prior to the second IHA, Conseco had not ordered an IHA and that the previous IHA had been completed by

the "agency." (Vowels Dep. 120.)

## Homemaker Benefits

Paula Hartman told Vowels that her brother Ted Hartman was providing all of the homemaking and transportation for Hartman and asked whether he could be reimbursed for this under the homemaker benefit provision of the HHC-4 Policy. (Vowels Dep.131.) Paula Hartman was informed by Vowels that the HHC-4 Policy does not cover care provided by a family member. (Vowels Dep. 130-31.) Vowels based this on her understanding of the HHC-4 Policy definition of "immediate family." (Id.) Conseco representative Joe Scrane also told Paula Hartman that immediate family members do not qualify. (Miller Dep. Ex. 2.) Isaah Gabriel, another Conseco representative, also thought that family members could not provide homemaker services and the claim was rejected on that basis. (Deposition of Gabriel Issah ("Issah Dep.") 8 Oct. 20, 2009.) However, Miller testified that family members can provide services under the Rider so long as they are not living in the home. (Miller Dep. 122.)

## Payment for Homemaker Benefits

Vowels erroneously told Paula Hartman that in order for the HHC-4 Policy to pay for a homemaker for seven (7) days per week, a policy holder has to be receiving home healthcare for seven (7) days per week. (Vowels Dep. 149-50.) After internal discussions, Conseco later determined that they would pay Hartman for homemaker services for periods when she was not receiving home healthcare benefits.

## Collection

In March of 2007, Conseco referred Hartman to a collection agency because Conseco had paid twice for one period of time. (Hartman Dep. 26, Ex. 9-11.) This was the first time Hartman

had been referred to a collection agency. (Id. 26.)

## **Billing and Payment Summary**

Hartman's claim was first opened when Paula Hartman called Conseco in August of 2006. (Miller Dep. 65-67.) The first claim form submitted by Ted Hartman was received on August 23, 2006, the first bills for his services were received on September 8, 2006, and the first payment was made on November 29, 2006. (Morris Aff. ¶ 8, Ex. B.) Ted Hartman billed for dates of service from August 22, 2006, to November 19, 2006, based upon 24 hours per day, 7 days per week at $8.00 per hour. (Id.) He then billed for 6 hours per day, 7 days per week at $24 per hour from November 27, 2006, through April 29, 2007. (Id.) Conseco analyzed the market for homemakers in Ohio and concluded that $16.53 per hour was reasonable for Ted Hartman's services and not $24 per hour. (Morris Aff. Ex. A)

The first claim payment, in excess of $10,000, was made on November 29, 2006. (Id. ¶ 7, Ex. B.) This payment was for claims between August 23, 2006, and November 6, 2006. (Id.) Subsequent payments for services provided by Ted Hartman or Comforcare were made on December 12, 2006, January 8, 2007, January 12, 2007, February 1, 2007, February 5, 2007, February 26, 2007, March 6, 2007, March 13, 2007, April 24, 2007, May 29, 2007, May 30, 2007 and May 31, 2007. (Id. Ex. B.) The total amount billed was $38,208.76 and the total amount paid was $31,598.48. (Id.)

## **Relevant Policy Provisions**

Hartman had Home Healthcare Insurance under Conseco's HHC-4 Policy, number 681131. (Hartman Dep. Ex. 2.) Relevant definition provisions of this Policy are as follows:

> "Approved Home Health Care Practitioner" …All practitioners, including home health aides, must be licensed or certified and may not be a member of your

family.

"Immediate Family" means the Insured, his or her Covered Spouse and their respective parents, children, grandchildren and siblings, or anyone living at their residence other than an Approved Home Health Care Practitioner.

"Reasonable Charge" means a charge which does not exceed the regular and customary charges for, or the fair and reasonable value of the services and supplies received by a Covered Person. The Reasonable Charge will be determined by comparing the expense incurred with the charges made for similar services and supplies in the locality where the services are provided.

According to Hartman's HHC-4 Policy, a benefit is paid for each day a Covered Person receives Home Health Care. The benefit is the lesser of the Daily Maximum Benefit set forth in the Policy Schedule or the Reasonable Charge incurred for services provided. The Policy also provides that Conseco has, at its expense, the right and opportunity to examine a claimant when and as often as Conseco may reasonably require while a claim is pending.

The Policy also provides that a potential buyer has thirty (30) days to examine the Policy and may return it within thirty (30) days if not satisfied for any reason. Any premiums paid will be returned.

The Rider provides that "the benefit for Homemaker Service will be equal to the Reasonable Charge… subject to the following limit: The benefit for Homemaker Services and the benefit for Home Health Care under the Policy will be subject, on a combined basis to… the Daily Maximum Benefit…"

## RELEVANT LEGAL PROVISIONS

### Motions for Summary Judgment

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and the associated caselaw. Rule 56 provides that summary

judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6ᵗʰ Cir. 1992)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in

support of its position. *Celotex Corp.*, 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, §2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

However, the mere existence of a scintilla of evidence in support of the nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The inquiry, then, is whether reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not …obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties. The Rule 56 evidence includes the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted. Fed. R. Civ. P. 56(c).

## **Applicable Substantive Law**

In addition to applying the federal procedural standard for motions for summary

judgment, as a federal court located in Ohio exercising diversity jurisdiction, this Court must apply Ohio substantive law unless the law of another state is specifically implicated. *Hisrich v. Volvo Cars of N. America, Inc.*, 226 F.3d 445, 449 (6th Cir. 2000). This Court must apply the substantive law of Ohio "'in accordance with the then-controlling decision of the highest court of the state.'" *Imperial Hotels Corp. v. Dore*, 257 F.3d 615, 620 (6th Cir. 2001)(quoting *Pedigo v. UNUM Life Ins. Co.*, 145 F.3d 804, 808 (6th Cir. 1998)).

To the extent that the highest court in Ohio has not addressed the issue presented, this Court must ascertain from all available data, including the decisional law of Ohio's lower courts, what Ohio's highest court would decide if faced with the issue. *Imperial Hotels*, 257 F.3d at 620 (6th Cir. 2001)*; Bailey v. V & O Press Co., Inc.*, 770 F.2d 601, 604 (6th Cir. 1985). Finally, where Ohio's highest court has not addressed the issue presented, a federal court may not disregard a decision of an Ohio appellate court on point unless the federal court is convinced by other persuasive data that the highest court of Ohio would decide otherwise. *Puckett v. Tennessee Eastman Co.*, 889 F.2d 1481, 1485 (6th Cir. 1989).

## **Breach of Contract**

In Ohio, a breach of contract occurs when there is a binding contract, when the non-breaching party performs its contractual obligations, the other party fails to fulfill its contractual obligations without legal excuse and the non-breaching party suffers damages as a result of the breach. *Maxey v. State Farm and Casualty Co.*, No. 1:07-cv-158, 2010 WL 518235 at *3 (S.D. Ohio Feb. 2, 2010). A breach-of-contract must be shown by a preponderance of the evidence, *Savedoff v. Access Group, Inc.*, 524 F.3d 754, 762 (6th Cir. 2008), and the plaintiff must present evidence sufficient to satisfy each of these elements to obtain summary judgment, *Maxey*, 2010

WL 518235 at * 3.

In Ohio, the interpretation of written contract terms, including a determination of whether those terms are ambiguous, is a matter of law for the court. *Id.* Contract language is ambiguous where its meaning cannot be determined from the contract or where the contract language is susceptible to two or more meanings. *Id.* Finally, if language in the contract is ambiguous, it is to be construed against the drafter. *Id.* at 764.

Also in Ohio, damages for emotional distress may not be recovered for a breach of contract. *Equal Employment Opportunity Commission v. Honda*, No. 2:06-cv-99233, 2007 WL 1541364 at *7 (S.D. Ohio May 23, 2007)(citing *Kishmarton v. Williams Bailey Construction, Inc.*, 754 N.E.2d 785 (Ohio 2001)). However, there is a narrow exception to this rule in cases involving transactions between vendees and building vendors. *Id.*(citing *Brainard v. American Skandia Life Assurance Corp.*, 432 F.3d 655, 665 (6th Cir. 2005)).

### Failure To Exercise Good Faith

Ohio recognizes that a fiduciary relationship exists between an insurer and an insured and has, therefore, recognized a claim for breach of the duty of good faith. *Maxey*, 2010 WL 518235 at *6. A lack of good faith is the equivalent of bad faith. *Donnelly v. State Farm Fire and Casualty Co.*, No. C-3-05-388, 2007 WL 2738788 at *5 (S.D. Ohio Sept. 13, 2007).

Mere refusal to pay insurance is not, in itself, conclusive of bad faith. *Maxey*, 2010 WL 518235 at *6. Thus, to prove a claim of failure to exercise good faith, a plaintiff must show that the insurer failed to exercise good faith in refusing to pay the claim by showing that such refusal was based upon circumstances that were not reasonably justified. *Id.*

An insurer may also show a lack of good faith where a claim is ultimately paid if the

insurer's foot-dragging in the claims-handling and evaluation process was based upon circumstances that were not reasonably justified. *Jay v. Massachusetts Casualty Insurance Co.*, No. 2006CA00201, 2006CA00229 and 2007 CA00243, 2008 WL 555440 at *12 (Ohio Ct. App. Feb. 27, 2008). In sum, the conduct of the insurer must be based upon circumstances that furnish reasonable justification therefore. *Maxey*, 2010 WL 518235 at *6(citing *Hoskins v. Aetna Life Insurance Co.*, 452 N.E.2d 1315, 1319 (Ohio 1983)).

Intent is not an element of the reasonable justification standard. *Zoppo v. Homestead Insurance Co.*, 644 N.E.2d 397, 400 (Ohio 1994). Thus, bad faith is shown only if the record shows that there were no circumstances that created a reasonable justification for the insurer's actions. *TOL Aviation, Inc. v. Intercargo Insurance Co.*, Nos. L-05-1308 and L-06-1050, 2006 WL 3334556 at *11 (Ohio Ct. App. Nov. 17, 2006).

Further, bad faith is more than bad judgment or negligence. *Hoskins*, 452 N.E.2d at 1320. Bad faith "imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud." *Id.* An insurer does not act in bad faith if the claim is "fairly debatable and the refusal was premised on either the status of the law at the time of the denial or the facts that give rise to the claim. *Maxey*, 2010 WL 518235 at *6(quoting *Tolkes & Son, Inc. v. Midwestern Indemnity Co.*, 605 N.E.2d 936, 943 (Ohio 1992)).

### Punitive Damages

Ohio law provides for punitive damages in tort actions. Ohio Rev. Code § 2315.21. Punitive damages are awarded for the purpose of punishing and deterring certain conduct. *Desai v. Franklin*, 895 N.E.2d 875, 890 (Ohio Ct. App. 2008). Further, the party seeking punitive

damages has the burden of proving its entitlement to them by clear and convincing evidence. *Id.*

Punitive damages may be awarded if the plaintiff receives compensatory damages and the actions or omissions of the defendant demonstrate malice or aggravated or egregious fraud. Id. Thus, in cases such as this, a claim for punitive damages must be based upon a finding of liability for bad faith on the part of the insurer. *Soriano v. State Farm Fire and Casualty Co.*, No. 3:07 CV 1148, 2008 WL 2079409 at *6 (N.D. Ohio May 15, 2008). Further, the conduct necessary to support an award of punitive damages is separate and distinct from the conduct sufficient to show bad faith on the part of the insurer. *Staff Builders, Inc. v. Armstrong*, 525 N.E.2d 783, 789 (Ohio 1988).

Malice is defined as (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm. *Desai*, 895 N.E.2d at 890 (citing *Calmes v. Goodyear Tire & Rubber Co.*, 575 N.E.2d 416 (Ohio 1991)). Malice may be inferred from conduct and surrounding circumstances. *Hoskins*, 452 N.E.2d at 1320-21.

## ANALYSIS

Hartman seeks summary judgment on her breach-of-contract claim and on her claim that Conseco failed to exercise good faith in the handling and processing of her insurance claim. She also seeks punitive damages on her failure-to-exercise-good-faith claim. Each of these assertions will be addressed seriatim.

### Breach of Contract

In this case, there is no question of fact that there is a binding contract. Conseco issued

HHC-4 Policy number 681131 to Hartman.[1] This Policy included a Homemaker Service Rider.

There is also no question of fact that Hartman paid all of the premiums due. Thus, she performed her contractual obligations.

Thus two of the four elements of a breach-of-contract claim are undisputed. However the remaining two elements, failure to fulfill by Conseco and damages, are disputed.

Breach of HHC-4 Policy By Conseco

Hartman argues that Conseco breached the HHC-4 Policy issued to her when Conseco failed to provide a Care Plus Consultant. The Care Plus Consultant is identified in the Care Plus Advantage portion of the Rider. The relevant language is:

> CARE PLUS ADVANTAGE: This feature of your Policy provides you with the knowledge, training and experience of a "Care Plus Consultant" who will meet with you to assess your individual needs and develop a Plan of Care to meet those needs. A Care Plus Consultant must develop a Plan of Care prior to our payment of any Homemaker Service benefits under the Rider. The cost of the Care Plus Advantage service will not in any way, limit or reduce the Daily Maximum Benefits available for covered care or service.
>
> The Care Plus Consultant will work primarily with you but may also consult with your Physician and family. After the Plan of Care is approved by us and accepted by you, your Care Plus Consultant will continue to assist you by monitoring and evaluating your progress as well as the quality of care or service you are receiving.
>
> In addition, your Care Plus Consultant may suggest changes in your Plan of Care on an ongoing basis to ensure that you are receiving the correct type and amount of care or service. Any changes in your Plan of Care must be accepted by you and approved by us. "Care Plus Advantage" has the following important benefits:
>
>      1.      Your Care Plus Consultant can explain your Plan of Care to your

---

[1] In her Motion for Partial Summary Judgment, Hartman extensively discusses the material used to market the policy but it is the HHC-4 Policy number 681131 that is at issue here and not the marketing material.

various care providers to help ensure that care or service is delivered efficiently and in a timely manner;

2.      Your Care Plus Consultant can ensure that you receive the appropriate type and amount of care or service;

3.      Your Care Plus Consultant can help you select the care providers best qualified to deliver the care or service you need; and,

4.      Your Care Plus Consultant may approve care or service on any given day which exceeds the Daily Maximum Benefit amount payable for that day. In such case, we will pay for such care or service under an Approved Plan of Care provided that the total expense incurred in any one calendar week does not exceed seven times the Daily Maximum Benefit.

The term "Care Plus Consultant" is also defined in the Rider as a:

registered nurse (R.N.) or licensed social worker or other medical professional employed by or under contract to a Care Coordination Organization, or otherwise designated by us who is qualified by training and experience to assess and coordinate your overall medical, personal and social services needs.

On October 26, 2006, Paula Hartman specifically requested a Care Plus Consultant.

(Miller Dep. 117-18; Miller Aff. Ex. A pp. 60-61.) Hartman testified that she was denied a Care

Plus Consultant because Conseco said she did not have the Care Plus Advantage Policy.

(Hartman Dep. 20.) Paula Hartman testified that Hartman never had a Care Plus Consultant.

(Paula Hartman Dep. 99.) Vowels testified that she was not a Care Plus Consultant, that she had

never heard of this term, that she did not know that the Homemaker Service Rider provided for

a Care Plus Consultant, and she did not know that a Care Plus Consultant was designed to

provide a robust coordination of medical, home and community services to a policy holder.

(Vowels Dep. 55, 72.) Miller testified that the Homemaker Service Rider provides that a Plan

of Care will be developed, that the Care Plus Consultant would provide that Plan of Care and

that Conseco never had an individual actually called a "Care Plus Consultant.". (Miller Dep.

41.)

Morris testified that she was familiar with the term "Care Plus Consultant" in the Rider and that Conseco had a "Case Manager" of managed care that assessed the patients, determined if the patients needed a plan of care and, if necessary, developed the Plan of Care. (Morris Dep. 13-15.) However, Morris also testified that she was not aware of anyone who made a claim for or received a Care Plus Consultant. (Id. 17-19.)

Conseco argues that, with the sole exception of "meeting" with the Hartmans in person, Vowels provided essentially all of the services and resources that are to be provided by a Care Plus Consultant. However, Conseco concedes that no person with the title "Care Plus Consultant" assisted with Hartman's care.

The same day that Paula Hartman requested the Care Plus Consultant benefit, Hartman's file was transferred to Conseco's Managed Care and reviewed by Vowels. (Morris Aff. Ex. A p 102.) Vowels then called Paula Hartman on that same day to discuss the care that Hartman was receiving and that a plan of care would be developed. (Id.)

Conseco also argues that Vowels satisfies the Rider definition of "Care Plus Consultant" because Vowels is a registered nurse who was specifically designated by Conseco to coordinate Hartman's care. (Morris Aff. Ex. A p. 102.) Examples of the services rendered by Vowels are included in the record. (Morris Aff. Ex. A p. 102-08, 115, 121-22.) These are examples of assessing individual needs and developing a plan of care, working with Hartman and consulting with her physician and family, assisting in obtaining the services outlined by the plan of care, monitoring and evaluating Hartman's progress and the quality of care being received, explaining Hartman's plan of care to her various care providers, ensuring that Hartman received

the appropriate type and amount of care and helping Hartman select her care providers.

Further, there was a Plan of Care dated November 22, 2006, and signed by either Hartman or Paula Hartman. (Vowels Dep. 168-169.) This Plan of Care provided home healthcare for six hours per day, seven days per week and homemaker services for six hours per day, seven days per week. (Id.)

There is undisputed evidence that no one from Conseco ever met with Hartman in person. But the Rider does not indicate that the meeting must be in person, and there is evidence of several telephone conversations regarding Hartman's care.

There is also evidence, undisputed at this time, that Conseco prepared a Plan of Care for Hartman. There is also evidence that Hartman or Paula Hartman signed off on this Plan of Care.

In addition, there is evidence that Conseco provided many, if not all, of the Care Plus Consultant Services that are required by the Rider. However, there is also evidence that Vowels, the Conseco employee who allegedly provided the services, was not aware of the term "Care Plus Consultant" or the specific care plus consultant services to be provided.

Thus, there are genuine issues of material fact as to whether Conseco breached the terms of the Rider by not providing a "Care Plus Consultant." On this basis, summary judgment cannot be granted to Hartman on her breach-of-contract claim. However, there is more.

Damages

In addition to showing that Conseco breached the HHC-4 Policy, Hartman must also show that she suffered damages as a result of the breach. Hartman argues that the Care Plus Consultant was a "substantial benefit" under the policy and that her damage is the lack of receiving the benefit. Conseco responds that the Care Plus Consultant benefit does not result in

-19-

any additional premium so Hartman cannot claim economic loss from paying for this benefit that she allegedly did not receive. Conseco further argues that Hartman has made no effort to ascribe any economic value to the Care Plus Consultant.

Hartman has the burden of identifying evidence that she was damaged as a result of Conseco's alleged failure to provide a Care Plus Consultant. This she has not carried. She argues that she suffered damages therefrom but has identified none. Therefore, because she has not shown damages, one of the elements of her breach-of-contract claim, she is not entitled to summary judgment on that claim.

## Failure To Exercise Good Faith

Ohio recognizes the tort of failure to exercise good faith with regard to a policy of insurance. Hartman cites several instances that she says shows that Conseco breached its duty of good faith[2]:

1. Failed to provide her with a Care Plus Consultant;

2. Refused to admit that she was entitled to Homemaker Services on three occasions;

3. Sent her to collection;

4. Incorrectly denied homemaker services benefits for work performed by Ted Hartman;

5. Refused to process her claims on numerous occasions;

6. Required her to undergo two separate benefit-eligibility assessments which included a duplicate assessment performed over her objection;

7. Incorrectly advised Paula Hartman that homemaker services could only be

---

[2]It should be noted that communications with Conseco were by Paula Hartman and Ted Hartman and not by Hartman herself. See Paula Hartman Dep. 98-99.

provided for the same days that home healthcare services were approved and paid for; and

8. Sent her correspondence in March of 2007 that only home healthcare services were approved under the Policy.

Each of these alleged instances of bad faith will be addressed seriatim.

Failure To Provide Care Plus Consultant

As more fully discussed above, there are genuine issues of material fact as to whether Conseco failed to provide the "Care Plus Consultant" benefits. Based upon the evidence presented, a reasonable person could conclude either way.

Refusal To Admit Entitlement To Homemaker Services

Hartman argues that Conseco acted unreasonably when it refused to admit that she was entitled to homemaker services on three occasions: twice on August 14, 2006 and once on August 24, 2006, during phone calls between Conseco representatives and Paula Hartman. For this, Conseco offers a reasonable explanation that could indicate that Conseco was not acting in bad faith.

The employees in Conseco's call center only had information on the general type of policy but, for some reason, did not have access to an exact copy of each individual policy. (Miller Dep. 22, 54.) Thus, Conseco's call center representatives only had access to general information regarding the type of policy. (Id.) Because there are different versions of a policy, a Conseco representative would need to obtain the specific policy and review the specific policy to make accurate determinations. (Id.) For some reason, Hartman's actual policy was not available on the computer system used by the call center representatives. (Morris Aff. Ex. A p. 025.) As soon as Hartman's specific policy became available on the computer system, a

Conseco representative acknowledged that Hartman's policy included the Homemaker Service Rider. (Id. p 037.) This was accomplished on August 29, 2006. (Id.) Further, on November 22, 2006, Teresa Frevert, Vowels' supervisor, instructed Vowels to certify homemaker care for payment retroactive to August 22, 2006 since Paula Hartman had initially been misinformed. (Morris Aff. Ex. A p. 107.)

Collection

Hartman next argues that it was unreasonable for Conseco to send her to collection for the first time in her life. However, Conseco's actions on this matter could be reasonable.

There is evidence that one double payment was made by Conseco in the amount of $1008. (See Paula Hartman Dep. 92, 95-96.) Ohio law permits Conseco to recover overpayments. See Ohio Rev. Code § 3901.388(B). Conseco attempted to recover this overpayment. Conseco informed Hartman at least twice that she had been overpaid and that the collection agency was handling the recovery of all of Conseco's overpayments. (Hartman Dep. Ex. 9-11.) It is this overpayment that Hartman alleges that Conseco attempted to collect. (Am. Compl. ¶ 27.)

Denied Homemaker Services Benefits for Work Performed By Ted Hartman

Hartman next argues that Conseco acted unreasonably when it denied her benefits for homemaker benefits that were provided by her son, Ted Hartman, despite the fact that family members who did not live with the policyholder are eligible to receive compensation for providing homemaker services. Conseco responds that it did not unreasonably question whether Ted Hartman resided in Hartman's home. Further, Conseco ultimately paid Ted Hartman for the services he provided.

When Paula Hartman required a hip replacement, Ted Hartman moved from Florida and began to provide services to Hartman. He billed Conseco for homemaker benefits from August 22 through mid-November of 2006.

The HHC-4 Policy will not pay homemaker benefits for a homemaker who is residing in the policyholder's home. (Morris Aff. Ex. A p 107.) Thus, when Ted Hartman submitted bills for homemaker benefits, Conseco considered the issue of Ted Hartman's residence in depth. (Morris Aff. Ex. A p. 188-21.) However, as soon as Ted Hartman faxed Conseco a utility bill showing that he had a residence other than his mother's, Conseco approved his claims for payment. (Id.)

Homemaker benefits are limited by the HHC-4 Policy to very specific tasks such as cooking and paying bills. Further, home healthcare can only be compensated for if it is given by a licensed provider who is not an immediate family member. Conseco knew that Ted Hartman, who is presumably not a licensed home healthcare provider, was providing both homemaker and home healthcare services and continued to pay him for both types of services. (Deposition of Harold "Ted" Hartman (Harold Hartman Dep.") Ex. 52 Feb. 24, 2010; Morris Aff. Ex. A p. 106.)

There was also an issue about the hourly rate at which Ted Hartman was reimbursed. He was initially reimbursed at the rate of $24 per hour. Conseco analyzed the market for homemakers in Ohio, as the HHC-4 Policy permits, and concluded that $16.53 per hour was reasonable for Ted Hartman's services and not $24 per hour. Conseco then began paying Ted

Hartman at the rate of $16.53 per hour.[3]

The issue of where Ted Hartman was residing was reasonably debatable. Further, good faith was shown when Conseco knowingly paid Ted Hartman for services that he was not qualified to provide.

Refused To Process Claims

Hartman next argues that Conseco acted unreasonably when it refused to process her claims on numerous occasions including a delay due to an alleged failure by Conseco to receive a Physician's Claim Form despite the fact that Conseco had actually received the Claim Form. However, Conseco's actions on this matter are also reasonable.

Morris has provided an Affidavit outlining the apparent reason why it took from early August of 2006 until November 29, 2006, for Conseco to make the first payment under Hartman's HHC-4 Policy. The claims adjuster would have to have itemized bills for services, daily progress notes, a provider claim form, a policyholder claim form, a physician's claim form and, if applicable, the provider's license. (Morris Aff. ¶ 10.)

All of this information for homemaker services from Ted Hartman was in Hartman's file as of September 8, 2006. (Id. ¶ 12.) However, the last information from the home healthcare provider, Alternate Solutions, was not in Hartman's file until October 16, 2006. (Id.) The first payment on Hartman's claim was made mailed on November 29, 2006.[4] (Id.) Ohio's prompt pay statute, Ohio Rev. Code § 3901.381(B)(1), gives an insurance company up to forty-five

---

[3]Most of the difference between what was billed by Hartman and what was paid by Conseco is explained by Ted Hartman continuing to bill at $24 per hour and Conseco paying at $16.53 per hour.

[4]Hartman's claim was first opened in late July or August of 2006.

(45) days to pay or deny a claim for which the insurer needs reasonably supporting documentation. The first payment on Hartman's claim was made forty-five (45) days after the last Alternate Solutions information was received. (Morris Aff. ¶ 12.)

To further complicate matters, Conseco provided two different interpretations of a section of the Rider that provides that benefits are not payable for any period of time, on a given day, during which Home Health Care is not required as determined by the Care Plus Consultant. At first, Conseco representatives interpreted this clause such that Hartman could not be provided with homemaker benefits unless she was receiving home healthcare at the same time. This precluded paying Hartman for only homemaker benefits. After further internal discussion, Conseco determined that the cost of homemaker services could be paid to Hartman for days when no home health aide was present. (Id. ¶ 13.)

The meaning of this language in the Homemaker Service Rider was reasonably debatable. Further, payment was made on Hartman's claim within the time allotted by Ohio law.

Required Two Separate Benefit-Eligibility Assessments

Hartman next argues that Conseco acted unreasonably when it required her to undergo two separate benefit-eligibility assessments despite the fact that her doctor had already certified her as needing around-the-clock homemaker services and four hours per day of home healthcare services. However, Conseco's actions on this issue may not be unreasonable.

Conseco was simply unable to find the first assessment when Vowels assumed management of Hartman's case. (Vowels Dep. 114-16.) So, Vowels asked for an assessment.

However, Vowels informed Paula Hartman that care with Alternate Solutions could continue[5] pending completion of the second assessment and Conseco paid for both assessments. (Morris Aff. Ex. A pp. 011, 102.) In addition, the HHC-4 Policy provides that Conseco has, at its expense, the right and opportunity to examine a claimant when and as often as Conseco may reasonably require while a claim is pending.

### Incorrectly Advised Regarding Provision of Homemaker Services Benefits

Hartman next argues that Conseco acted unreasonably when it incorrectly advised Paula Hartman that homemaker services could only be provided for the same days that home healthcare services were approved and paid for. Conseco may have acted reasonably on this matter as well.

As more fully discussed above, the Rider provides that benefits are not payable for any period of time, on a given day, during which Home Health Care is not required as determined by the Care Plus Consultant. At first, Conseco representatives interpreted this clause such that Hartman could not be provided with homemaker benefits unless she was receiving home healthcare at the same time. This interpretation was provided to Paula Hartman. This interpretation also precluded paying Hartman for only homemaker benefits. After further internal discussion, which took place in a reasonable amount of time, Conseco determined that the cost of homemaker services could be paid to Hartman for days when no home health aide was present. (Id. ¶ 13.)

### March 2007 Correspondence that Only Home Healthcare Services Were Approved

---

[5]At the time, the plan was that Alternative Solutions would be paid as the home healthcare service provider after Medicare was exhausted. (Morris Aff. Ex. A p. 103.)

Hartman's final argument is that Conseco acted unreasonably when it sent correspondence to her indicating that only home healthcare services were approved despite the fact that Conseco certified her claim for homemaker services in November of 2006. The letter, dated March 6, 2007, indicates that Conseco has paid several of Hartman's claims and indicates that expenses submitted include services provided by Ted Hartman for January 15 to 21, January 29 to February 4, February 5 to February 11 and January 22 to 28. The letter further states that, "Your policy only provides benefits for home health care services. No evidence of home healthcare was submitted, therefore, benefits are not available for this service."

Hartman has provided one interpretation of this letter and Conseco has not responded. However, there is another interpretation. Another reasonable interpretation could be that Hartman submitted claims only for homemaker services and not for home healthcare services and, since no claims for home healthcare were submitted, none were paid. Conseco had already, however, made payments on Hartman's claim. (Morris Aff. ¶ 7, Ex. B.)

Taken alone, the statement that, "Your policy only provides benefits for home health care services" is not correct. However, Paula Hartman was already aware that it was not correct, Conseco had already made payments, and the letter provides for a dispute resolution process.

### Conclusion On Failure-To-Exercise-Good-Faith Claim

Hartman has not shown that Conseco failed to exercise good faith in the claims handling and evaluation process. All of the issues raised by Hartman required analysis by Conseco and all were ultimately decided in Hartman's favor. Therefore, summary judgment will not be granted on Hartman's failure-to-exercise-good-faith claim.

### **Punitive Damages**

Hartman asks the Court to award punitive damages as a matter of law. However, punitive damages will not be considered because they are not available unless Hartman is awarded compensatory damages on her tort claim and she has not yet been awarded compensatory damages on her tort claim. Thus, summary judgment will not be granted on Hartman's claim for punitive damages.

## CONCLUSION

There are genuine issues of material fact as to whether Conseco breached the contract of insurance that it had with Hartman. Further, Hartman has not shown that Conseco failed to exercise good faith in the claims handling and evaluation process. Finally, Hartman has not yet shown that she is entitled to compensatory damages on her failure-to-exercise-good-faith claim and is thus not yet entitled to punitive damages. Therefore, Hartman's Motion for Partial Summary Judgment is OVERRULED.

The Court did not find the LaGravinese's testimony relevant to any of the issues which it needed to decide. Therefore, Conseco's Motion To Strike portions of LaGravinese's deposition (doc. #71) is now MOOT but subject to renewal if and when necessary.

**DONE** and **ORDERED** in Dayton, Ohio this Eighteenth Day of May, 2010.

**s/Thomas M. Rose**

_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record